JANE B. STRANCH, Circuit Judge, dissenting. At issue in this case is whether Dr. Fakorede stated a claim against his employer for retaliation in violation of the False Claims Act (FCA). To make this determination, we accept as true the allegations of the complaint and evaluate their viability under the provisions of the FCA in force at the time of the filing. Dr. Fako-rede filed his complaint after the FCA was amended in 2009 to expand the protections — and therefore claims — available to qui tarn, relators. Because I believe that Dr. Fakorede’s complaint states a claim under the amended FCA, I respectfully dissent. The FCA is the key tool employed by the government to require that fraudulently claimed funds be returned to the United States and its citizens. Many FCA cases rely on whistleblowers within companies to find and report such fraud,' collect evidence, and sometimes litigate the claims. But whistleblowers face serious risks, as employers are unlikely to shrug off leaks of incriminating information from within their own ranks. The FCA has long protected whistleblowers by authorizing a cause of action for employees who have been retaliated against for involvement with an FCA claim. Traditionally, civil relief for retaliatory actions could be sought by those “in furtherance of an action under [the FCA].” 31 U.S.C. § 3730(h)(1). Because judicial narrowing of the scope of the FCA led to a decline in such cases and a significant drop in monies recovered, Congress sought to make the FCA more effective by expanding protection for whis-tleblowers. S. Rep. 111-10, 4. Under the FCA as amended in 2009, the ability to seek relief was made available not just to those acting “in furtherance of an action” under the FCA but also to those who undertook “other efforts to stop 1 or more violations of this subchapter.” 31 U.S.C. § 3730(h)(1). The amended FCA and subsequent cases show that Dr. Fakorede states a claim within the category of those protected by the FCA’s retaliation provision. This claim arose in the context of Dr. Fakorede’s concern about expenses that were attributed to his practice and thereby retained by his employer, Mid-South. In December 2014, he began requesting financial information from the Hospital that was late and, upon its receipt, raised issues with multiple executives and requested an audit. On January 30, 2015, he was told that over $200,000 of expenses claimed by Mid-South were disallowed. In response, Dr. Fakorede made multiple requests in early February for information about the audit he had requested, emphasizing that his contract contains express language on expenses permitted by federal law. The Hospital told him on February 9 that a line-item audit was in progress. Mid-South terminated Dr. Fakorede on February 10. He was right to be concerned — the audit Dr. Fakorede requested ultimately found that Mid-South claimed over $314,000 in expenses related to his medical practice that were improper. Dr. Fakorede had correctly warned that the improper expenses could constitute an “illegal kickback scheme.” Healthcare providers who participate in Medicare and Medicaid — which includes all major providers — certify that they are complying with the Stark Law and Anti-Kickback Statute when they submit claims for payment. See CMS-1500, https://www.cms.gov/Medicare/ CMS-Forms/CMS-Forms/Downloads/CMS 1500.pdf (last visited Sept. 18, 2017) (“In submitting this claim for payment from federal funds, I certify that: ... this claim ... complies with all applicable Medicare and/or Medicaid laws, regulations and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law).... ”). “Falsely certifying compliance with the Stark or Anti-Kickback Acts in connection with a claim submitted to a federally funded insurance program is actionable under the FCA.” United States ex rel. Kosenske v. Carlisle HMA, Inc., 554 F.3d 88, 94 (3d Cir. 2009) (internal citations omitted). The majority opinion finds that Dr. Fa-korede did not adequately plead that he reasonably believed he was engaged in conduct to prevent fraud against the federal government. Maj. Op. 789. However, Dr. Fakorede pled that on multiple occasions, he pointed out his concerns over “an illegal kickback scheme.” He specifically mentioned a “violation of Stark Laws” in an email to executives in the immediate aftermath of his termination. Even the recruiting agreement that was the basis for the claimed expenses stated that Mid-South would include “only those expenses which are legally permitted by federal laws governing recruiting agreements.” Dr. Fakorede’s statements and actions occurred within the context of the healthcare industry, where sophisticated parties such as those involved here are well aware that claims submitted to Medicare are paired with certifications of compliance with applicable laws. In the complaint, Dr. Fakorede pointed out that Stark Law and Anti-Kickback Statute violations can “taint” claims that are made for services covered by Medicare or Medicaid, federally funded programs, Even if the factual basis for some of the steps could have been laid out in more detail, an FCA retaliation claim does not require pleading with particularity. Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson, 545 U.S. 409, 416 & n.1, 125 S.Ct. 2444, 162 L.Ed.2d 390 (2005). The only question before us is whether Dr. Fako-rede’s complaint states a claim. Drawing on “judicial experience and common sense” to undertake the “context-specific task” of Rule 12(b)(6), Ashcroft v. Iqbal, 556 U.S. 662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), I believe that Dr. Fakorede adequately pled a reasonable belief that fraud was being committed against the federal government and that Mid-South retaliated against him for acting on that belief. I therefore respectfully dissent.